Argued and submitted July 19, 2012, reversed and remanded in part; otherwise affirmed March 27, 2013

John MILLER,
Randy Olson,
Herbert Goss,
Douglas Babcock,
Henry Jackson,
and Michael Palin,
*Plaintiffs-Appellants*,

*v.*

CITY OF PORTLAND,
an Oregon municipal corporation,
*Defendant-Respondent.*

Multnomah County Circuit Court
081014715; A145318

298 P3d 640

Montgomery W. Cobb argued the cause for appellants. With him on the briefs was Montgomery W. Cobb, LLC.

Franco A. Lucchin argued the cause for respondent. With him on the brief was Harry Auerbach.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

SERCOMBE, J.

**SERCOMBE, J.**

This case arises out of the City of Portland's adoption and implementation of a return-to-work program for disabled firefighters. Plaintiffs, disabled firefighters who were required to return to work under the program, filed an action for breach of contract against the city in circuit court. In addition, plaintiffs alleged that the city, in its implementation of the return-to-work program, had breached its duty of good faith and fair dealing in the administration of their employment contracts. The city moved for summary judgment, asserting, among other things, that plaintiffs had failed to exhaust available administrative remedies and that plaintiffs' allegations, if proved, would not amount to a breach of contract. The court agreed with the city and granted summary judgment on both of those grounds. Plaintiffs now appeal, asserting that the court erred in concluding that they were required to exhaust administrative remedies and that their allegations did not amount to a breach of contract. For the reasons explained below, we affirm the trial court's judgment in part and reverse and remand in part.

The basic background facts on summary judgment are as follows. Chapter 5 of the charter for the City of Portland establishes the Fire and Police Disability, Retirement and Death Benefit Plan. The charter provides for creation of a Fire and Police Disability and Retirement Fund (FPDR) and a board of trustees to supervise and control the fund. As permitted by the charter, administration of the fund is delegated to a "Fund Administrator." Section 5-306 of the plan provides for service-connected and occupational disability benefits for members.

Plaintiffs were employees of Portland Fire & Rescue. As plan members who suffered disabling injuries in the course of their duties, plaintiffs each received disability benefits pursuant to the plan. Plaintiffs each received those benefits over a number of years.

In 2006, plaintiffs received written notice that, as part of the city's return-to-work program, they were required to attend mandatory EMT training. Furthermore, plaintiffs were notified that FPDR would continue their disability

benefits during training but that, in the event that they failed to attend the training, "the Fund w[ould] begin the process of suspension or termination of [their] benefits." Thereafter, as part of the return-to-work program, plaintiffs were required to return to work in light-duty positions (such as "low hazard fire inspector") that had not existed when they became disabled. Although their job assignments were different when they returned to work, plaintiffs' positions were in the same job classifications as the positions that they had held when they became disabled.[1] The city sought and obtained approval from plaintiffs' physicians for plaintiffs to work in those positions. In addition, FPDR subsidized the wages paid to plaintiffs once they returned to work.

One plaintiff, Olson, did not comply with the requirements of the return-to-work program. Accordingly, he received written notice dated April 12, 2007, that his disability benefits were terminated effective April 5, 2007, because he was "no longer disabled or eligible." The notice advised Olson:

"You have 14 days from the date of this letter to provide a written response for the Director's consideration.

"If the Director does not hear from you within the 14-day time frame, this denial is affirmed and you then have 60 days from April 26, 2007 to appeal to a hearings officer. * * * An untimely request for hearing may be accepted by the Director, upon a finding of good cause."

(Boldface omitted.) In a letter dated April 26, 2007, Olson sought reconsideration of the termination of his benefits. However, he received no response to that request for reconsideration. Aside from Olson, plaintiffs complied with the requirement that they return to work in the assigned light-duty positions.

Ultimately, plaintiffs filed an action against the city seeking damages and injunctive relief. In their second amended complaint, they alleged that they were entitled to receive disability benefits under the plan "because they were unable to perform the required duties of their chosen

---

[1] One plaintiff ultimately returned to work in a different job classification as the result of a promotion.

occupation—Firefighter—as the particular Disabled Fire-fighter's duties and qualification requirements were defined at the date of injury or disability." Furthermore, they were entitled "to receive a minimum benefit of 25% of normal full time wages regardless of medical status or subsequent earnings from other employment." Plaintiffs asserted that the plan (and particularly section 5-306 of the charter), along with the city's course of dealing and oral and written promises, constituted a contract and that the city "promised and was contractually obligated to continue the Disabled Firefighters' entitlement to disability benefits until each of the Disabled Firefighters' death or retirement" and was "prohibited by law from unilaterally changing the terms of the Plan." The complaint alleged that the city had promised each plaintiff that "he would not be required to return to work for the City," and that each plaintiff had relied on that promise to his detriment. In plaintiffs' view, the city had breached its contractual obligations to them through implementation of the return-to-work program.[2] They also alleged that the city had breached its duty of good faith and fair dealing in various ways. Plaintiffs asserted that, as a result of the city's breaches, each of them had been damaged in the sum of $800,000; they sought a judgment of a total of $4.8 million, and "an order requiring the City to reinstate the Disabled Firefighters' rights to disability benefits under the Plan, vacating the 'return to work program,' permanently enjoining the City from terminating the disability benefits of the Disabled Firefighters, and from requiring them to return to work in non-Firefighter positions," along with attorney fees.

The city moved for summary judgment on a number of grounds. In particular, it asserted that it was entitled to summary judgment because (1) the breach of contract claim was based on representations not contained in the

---

[2] According to plaintiffs, the city (1) informed them that they were required to "return to work as an employee of the City in a position other than Firefighter, or face termination of * * * disability benefits," (2) disseminated a "Return to Work Policy - Pilot Program," (3) required them to go to particular medical providers and "interfered with [their] medical care by pressuring the treating physicians and forcing the Disabled Firefighters to discontinue care with certain physicians," and (4) withheld benefits "in order to coerce treating physicians to issue reports or comply with City requests."

charter or authorized by ordinance and the city "cannot be contractually bound by oral promises or writings that were not adopted by ordinance"; (2) the charter did not create a contract with plaintiffs; (3) even if Chapter 5 of the charter did create a contract, the city did not breach the contract; (4) it could not breach the contract or breach the duty of good faith and fair dealing by taking actions that were expressly authorized by the terms of the contract; (5) the court did not have subject matter jurisdiction over the dispute because plaintiffs failed to exhaust their administrative remedies; and (6) plaintiffs had waived all other remedies by applying for and accepting disability benefits.

The trial court agreed with the city that plaintiffs "had the obligation to exhaust their administrative remedies before turning to the court for relief." Because it concluded that plaintiffs had "failed to exhaust their administrative remedies as required by law," it granted summary judgment. In the alternative, the court noted that it "could not relate the breach to anything in the actual contract" and, therefore, concluded that defendant had not breached its contract with plaintiffs and that summary judgment on that basis was appropriate. However, the court determined that there were genuine issues of material fact regarding whether there was a contract between the parties and whether defendant had breached its duty of good faith and fair dealing and, therefore, would have denied summary judgment on those bases. Furthermore, the court declined to reach the issue of waiver or any of the other issues raised on summary judgment. Based on its rulings, the court entered a general judgment in favor of the city. Plaintiffs now appeal that judgment, raising two assignments of error.

On appeal, we review the trial court's grant of summary judgment to determine whether we agree that "there is no genuine issue as to any material fact and that the moving party is entitled to prevail as a matter of law." ORCP 47 C; *O'Dee v. Tri-County Metropolitan Trans. Dist.*, 212 Or App 456, 460, 157 P3d 1272 (2007). There is no genuine issue of material fact if, "based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the

adverse party on the matter that is the subject of the motion for summary judgment." ORCP 47 C. Furthermore, "[t]he adverse party has the burden of producing evidence on any issue raised in the motion as to which the adverse party would have the burden of persuasion at trial." *Id*.

In their first assignment of error, plaintiffs contend that the trial court erred in granting summary judgment on the ground that plaintiffs had failed to exhaust their administrative remedies. Plaintiff Olson makes separate arguments on the exhaustion issue from the remaining plaintiffs. We begin by addressing the assertions of plaintiffs other than Olson. Those plaintiffs contend that there was never a decision that they could have challenged through the administrative process. Specifically, plaintiffs argue that the adoption and implementation of the return-to-work program was not an appealable event and that, because they complied with the requirements of the program, there was never a decision regarding their benefits that they could have appealed through the city's administrative process. In addition, plaintiffs point out that the city did not provide them with any notice of a decision "to suspend, reduce or terminate benefits" (as would be required pursuant to the city's rules) and, therefore, the administrative appeal process was not triggered or, in the alternative, the city "waived its right to assert that the plaintiffs failed to exhaust their administrative remedies."

The city, for its part, asserts that plaintiffs "had adequate notice of a decision of the Fund Administrator adversely affecting their FPDR benefits when their FPDR benefit checks stopped arriving, when they began receiving retirement benefits based on the service credited, or when they began receiving wages (and, therefore, no more disability benefits) for the return-to-work positions." Furthermore, the city notes that plaintiffs received letters from the city regarding the return-to-work program and those letters advised plaintiffs of the consequences of failure to comply with the requirements of the program. The city also asserts that the administrative scheme is "fixed by the City Charter" and that the charter put plaintiffs on notice of the administrative remedies necessary to challenge "an

adverse decision of the Fund Administrator." (Underscoring omitted.)[3]

As explained below, we agree with plaintiffs that, under the circumstances presented in this case and, given the provisions of the charter and the city's administrative rules, there was not an administrative review procedure available to plaintiffs. On that basis, we conclude that the trial court was incorrect in its determination that plaintiffs were required to exhaust administrative remedies before seeking relief in circuit court.

"It is a general principle of administrative law that a party must exhaust available administrative remedies before seeking [judicial] review of an agency's action." *Reforestation General v. Natl. Council on Comp. Ins.*, 127 Or App 153, 158, 872 P2d 423, *adh'd to on recons*, 130 Or App 615, 883 P2d 865 (1994), *rev den*, 320 Or 749 (1995). Thus, when "any charter or statute sets out a procedure whereby an administrative agency must review its own prior determination, that procedure must be followed." *Miller v. Schrunk*, 232 Or 383, 388, 375 P2d 823 (1962). Only after available procedures within the administrative body have been followed may a party seek judicial review of the administrative body's action. *Id.*

The "doctrine of exhaustion * * * is somewhat 'flexible' and is judicially employed to further 'orderly procedure and good administration.'" *Ayres v. Board of Parole*, 194 Or App 429, 436, 97 P3d 1 (2004) (quoting *Marbet v. Portland Gen. Elect.*, 277 Or 447, 456, 561 P2d 154 (1977)). Thus, an administrative remedy must be available, and it "must be adequate to redress the aggrieved party's interests." *Id.* (citing *Nutbrown v. Munn*, 311 Or 328, 344-46, 811 P2d 131 (1991), *cert den*, 502 US 1030 (1992)).

Here, the charter provision referenced by the city in support of its argument, section 5-202(h), addresses the processing of claims for disability benefits. It provides:

"(h) Disability Claims Processing.

---

[3] The city also reprises its contention before the trial court that plaintiffs "waived all other remedies by applying for and accepting FPDR disability benefits." (Underscoring omitted.) We reject that argument without published discussion.

"1. Restoring injured workers physically and economically to a self-sufficient status in an expeditious manner and to the greatest extent practicable is an important aspect of any disability system.

"2. All claims by FPDR Two and FPDR Three Members for service connected and occupational disability benefits under Sections 5-306 and 5-308, for nonservice connected disability benefits under Sections 5-307 and 5-309, benefits on service connected or occupational death before retirement under Section 5-308 and benefits for nonservice connected death before retirement under Section 5-309 shall be adjusted, administered and decided by the Fund Administrator. The decision of the Administrator shall be made in accordance with this Charter and the rules and regulations adopted by the Board.

"3. A[n] FPDR Two or FPDR Three Member * * * adversely affected by a determination of the Fund Administrator may appeal that decision to a hearings officer within 60 days of the date of the decision of the Fund Administrator. The hearings officer shall conduct an evidentiary hearing under the rules of procedure and evidence established by the Board. The hearings officer shall have the power to administer oaths, subpoena and examine witnesses, and require the production and examination of papers and documents. The decision of the hearings officer shall be in writing and shall be issued within 30 days after the close of the evidentiary record. The decision shall be based on the evidence presented at the hearing.

"4. The decision of the hearings officer shall be final unless an appeal to the independent panel is filed by the Member * * * or the Fund Administrator * * * within 30 days of the hearings officer's decision. The decision of the independent panel shall be de novo and shall be the final decision of the Fund and may be appealed to the circuit court as provided by state law."

The administrative rules associated with the plan provide that, for disability benefits,

"if the Director obtains evidence that * * * the Member is no longer disabled or eligible * * * the Director shall notify the Member of the Director's decision to suspend, reduce or terminate benefits. A summary of the evidence and the decision shall be provided to the Member. * * * The Member

will have 14 days to provide a written response for the Director's consideration. The Member shall also be notified of the rights under Charter Section 5-202(h) and the right to appeal for a Hearing as provided for in Section IV [of the administrative rules]. Any such written request must be filed with the Director within 60 days after the date of the decision being appealed."

Fire and Police Disability, Retirement and Death Benefit Plan, Administrative Rules § III(G)(7).[4] Section IV of the rules, in turn, sets forth hearing procedures for disability claims.[5]

Thus, under the charter provision at issue, disability claims are decided by the fund administrator, and a member who receives an adverse decision from the administrator may appeal "that decision * * * within 60 days of the date of the decision." Similarly, under the administrative rules, the director of the fund may decide claims; the director may also determine (among other things) that a member is no longer disabled or eligible for benefits. In that event, the director notifies the member of a decision to "suspend, reduce or terminate benefits" and the member has "60 days after the date of the decision being appealed" to seek administrative review of that decision.

The problem with the city's contention that those provisions apply to the circumstances presented here is that plaintiffs are not seeking review of a "decision" of the director that is among those addressed in the charter or rules.

---

[4] We quote the version of the rules pertaining to administrative remedies that were in effect in 2007 and were attached as an exhibit to the summary judgment motion.

[5] That section of the rules also contains a specific appeal provision. Under that provision,

"[t]he Director may approve or deny an initial claim. The Member will be notified of the Director's decision. If the Director denies a claim, the Member will be notified in writing of the decision along with the notice of the right to request a fact-finding hearing. If a Member wishes to proceed with a hearing, a request for hearing signed by or on behalf of the Member must be made, in writing, and received by the Director within 60 days of the mailing date of the denial. An untimely request for hearing may be accepted by the Director, upon a finding of good cause for the untimely request. Good cause for an untimely request shall be determined by the Director and may be established as provided for in Oregon Rule of Civil Procedure 71B."

Section IV(B)(1).

Plaintiffs challenge the city's program that required them to return to work after they had been considered permanently disabled for a number of years. Their breach of contract claim centers on that return-to-work program—it alleges that the city's adoption and implementation of the program was unlawful and that plaintiffs were damaged as the result of the implementation of the program. According to plaintiffs, the city, among other things, required them to return to work "in a position other than Firefighter" and threatened that failure to comply with the program would result in termination of their benefits. The direction from the city requiring plaintiffs to return to work is not a determination of the fund administrator under charter section 5-202(h) based on a claim for disability benefits. Furthermore, although the administrative rule contemplates that the director may determine that a member is no longer "disabled or eligible" and, accordingly, suspend, reduce, or terminate benefits, the rule requires that the director notify a member of any decision to do so. It further requires that the director provide the member with a "summary of the evidence and the decision" and notice of hearing and other appeal rights. Here, it is undisputed that plaintiffs were not provided with a notice that the director had decided to suspend, reduce, or terminate their benefits under the rule, nor were they given a summary of the evidence or information regarding appeal rights. Because plaintiffs complied with the return-to-work program as required, although their disability and retirement benefits were affected, they were not subject to a decision by the director of the fund as is contemplated by either the charter or the applicable administrative rule to begin the running of the 60 days to file an administrative appeal. Under the circumstances presented here, plaintiffs did not have available administrative remedies that they were required to exhaust before seeking relief in circuit court. For that reason, with respect to plaintiffs other than Olson, the circuit court incorrectly granted the city summary judgment based on the failure of those plaintiffs to exhaust administrative remedies.

The analysis differs for Olson. Unlike other plaintiffs, the director did make a benefits decision as to Olson. In particular, as noted, Olson failed to comply with the

requirements of the return-to-work program and, for that reason, the director notified Olson that his disability benefits would be terminated. Thus, Olson does not assert that there was no decision as to him but, instead, contends that the decision was not final. In particular, citing *Harrington v. Board of Trustees*, 100 Or App 733, 788 P2d 1019, *rev den*, 310 Or 133 (1990), Olson argues that the letter notifying him of the termination of his disability benefits was "conditional, not final" and that it "became final only if no request for reconsideration was received." Because Olson submitted a request for reconsideration and received no response, he asserts that he never received a final decision. Furthermore, Olson contends that his administrative remedies should have been "deemed denied" after the city failed to take any further action in response to his request for reconsideration.

The city responds that the notice sent to Olson was not "provisional." Rather, according to the city, the notice, "in effect, allowed Olson more than 60 days to request a hearing," but he has not done so. Furthermore, with respect to the assertion that Olson's administrative remedies were "deemed denied," the city asserts that the cases relied on by Olson demonstrate that he would be permitted to "skip the independent hearings officer and independent review panel remedies" only if he had "requested a hearing or review of the independent hearing officer's decision and FPDR failed to refer the matter for a hearing." As explained below, we conclude that, under the circumstances, Olson was required to complete the administrative process before seeking judicial review.

We begin by addressing the contention that the director's decision to terminate Olson's benefits was not "final." Again, the charter and rules provide that the director decides claims for benefits and whether to suspend, reduce, or terminate benefits based on evidence that a member is no longer disabled or eligible. The charter and rules provide that a member has 60 days from the date of a decision to seek a hearing regarding the decision. In addition, under the rules, a member is permitted "14 days to provide a written response" to the decision for the director's consideration. As set forth above, Olson was notified that his disability benefits were being terminated:

"After careful review and based on factual evidence, we must respectfully advise you that your disability benefits have been terminated effective April 5, 2007, for the following reasons:

"Administrative Rule III (G)(7)(d) states that if the Director obtains evidence that the Member is no longer disabled or eligible, the Director shall notify the Member of the Director's decision to suspend, reduce or terminate benefits."

In addition, Olson was advised that he had "14 days from the date of this letter to provide a written response for the Director's consideration." (Boldface omitted.) If he failed to respond within the 14 days, "this denial is affirmed and you then have 60 days from April 26, 2007 to appeal to a hearings officer." Thus, both the administrative rule and the notice sent to Olson provide for a step in the administrative review process in addition to that set forth in the charter; they provide an interim review step by which a member may seek reconsideration by the director of the director's decision to suspend, reduce, or terminate benefits.

In *Harrington*, we considered the issue of when a decision to terminate a member's disability benefits as a result of the member's recovery could be considered final in circumstances where a member had requested that the decision be reviewed by a medical panel. We examined the text of the charter provision at issue and concluded that "[w]hen recovery occurs depends on when the Board makes its final determination. If the member does not request a review panel after the Board's initial determination that the member is no longer entitled to benefits, that determination is final and the member is deemed recovered." 100 Or App at 737. On the other hand, "if the member does request review, the member cannot be deemed recovered until the Board finally determines that the member is no longer entitled to benefits based on the panel's findings." *Id.* Thus, we concluded that, before a requested interim review step was completed, the decision to terminate the member's benefits had not become final.

Here, assuming that the letter to Olson is binding on the city in terms of the administrative process outlined

therein, *see Wiggins v. Barrett & Associates, Inc.*, 295 Or 679, 683, 669 P2d 1132 (1983) (outlining circumstances where a municipality can be bound by representations of its agent), its text suggests that the decision may not yet be final if a written response is filed for the director's consideration. However, the fact that, by virtue of Olson's written response, the director's decision may not have been final does not suggest that Olson was excused from the need to follow the administrative review process. Instead, it means that he began the administrative review process when he sought reconsideration.

That brings us to Olson's next assertion. He contends that, because he did not receive anything further after submitting his written response to the director's decision, we should apply the rationale of certain federal ERISA cases to conclude that his administrative relief is "deemed denied" and consider his administrative remedies exhausted.[6] Olson does not cite an Oregon authority in support of that theory. However, we touched on the concept in the context of Oregon administrative law in *Taylor v. Board of Parole*, 200 Or App 514, 115 P3d 256, *rev den*, 339 Or 475 (2005). In that case, the petitioner asserted that "we should treat a request for administrative review as denied—and, therefore, the exhaustion requirement as met—if the [administrative body] does not dispose of the request within a 'reasonable' time." *Id.* at 519. We declined to apply that approach in that case because, compared with other statutes treating unresolved requests for relief as deemed denied after a certain time had passed, the statute imposing the exhaustion requirement in that case imposed "no such time limit." *Id.* Here, like in *Taylor*, neither the charter nor the administrative rules set forth circumstances in which a party's request for relief will be "deemed denied."[7] Furthermore, we observe that neither

---

[6] In support of his "deemed denied" argument, Olson cites *Nichols v. Prudential Ins. Co. of America*, 406 F3d 98 (2d Cir 2005), and *Gatti v. Reliance Standard Life Ins. Co.*, 415 F3d 978 (9th Cir 2005).

[7] In *Taylor*, we accepted "the general proposition" that, consistently with the exhaustion requirement, this court could have jurisdiction over an administrative order where the administrative body "through protracted inaction, has unreasonably failed to resolve a request for administrative review of that order." 200 Or App at 521. Under those circumstances, "administrative review might be so frustrated by neglect or inaction as to be futile." *Id.* We concluded that the facts of that case did not rise to a level that would indicate that administrative review

the notice nor the charter or administrative rule at issue here suggested that Olson *could not* seek a hearing in the absence of a response from the director to Olson's written response to the decision. Rather, the text in the letter merely indicated that he had additional time before he would need to file a request for a hearing to come within the 60-day time limit. Thus, we conclude that the trial court did not err in granting summary judgment with respect to Olson's claim based on his failure to exhaust administrative remedies.

In their second assignment of error, plaintiffs contend that the trial court "erred in granting summary judgment on the ground that there was no breach of the contract." A part of plaintiffs' analysis under that assignment of error is based on the express terms of the charter.[8] According to plaintiffs, as long as they remained eligible, the city was obligated to continue paying them at least "25% of normal full time wages." However, as part of its implementation of the return-to-work program, the city required plaintiffs to work in positions other than the job they held at the time they became injured and then, once they began to work in those jobs, reduced their monthly disability benefits below that 25 percent floor even though, in plaintiffs' view, they remained eligible for benefits.

Section 5-306(a) of the charter provides that a member is eligible for disability benefits "when unable to perform the Member's *required duties* because of an injury or illness arising out of and in the course of the Member's employment."[9] (Emphasis added.) It is plaintiffs' position that the term "required duties," as used in that section,

was futile. Here, Olson does not argue that the failure of the director to provide a response to the request for reconsideration frustrated the administrative process and made it futile; he only contends that, under the circumstances, he should be treated as having exhausted his administrative remedies. Furthermore, we do not understand plaintiffs' argument that the city "waived" its argument regarding exhaustion of remedies to refer to Olson. To the extent that Olson intends that contention to extend to him, we reject it.

[8] As noted, the trial court concluded that there were issues regarding whether there was a contract and would not have granted summary judgment on that basis. For that reason, for purposes of discussion, we assume that the charter provisions constituted a contract between plaintiffs and the city.

[9] The charter has been amended since the events that gave rise to this case. The text in question is now set forth in section 5-306(b) of the charter. We cite the version in effect during the pertinent time period.

means the particular job duties they were assigned "at the time of injury or onset of disability." Their argument that the city breached the express terms of the charter is dependent on the premise that the term "required duties" in section 5-306 of the charter means the member's job before the member became disabled. Based on the text of the term at issue, in context, *see Watkins v. Josephine County*, 243 Or App 52, 57-59, 259 P3d 79 (2011) (setting forth method for interpreting legislative and quasi-legislative contracts), we are unpersuaded by plaintiffs' contentions regarding the meaning of the term "required duties."

As noted, under section 5-306(a) of the charter,

"[a]n Active Member shall be eligible for the service-connected disability benefit when unable to perform the Member's required duties because of an injury or illness arising out of and in the course of the Member's employment in the Bureau of Police or Fire."

Thus, under the charter, eligibility for disability benefits is measured at the time an employee is an "active member." An active member, in turn, is defined in section 5-301(b) of the charter as "a person who is actively employed as a Member in the Bureau of Fire or Police and does not include a Member receiving benefits under this Chapter." Thus, eligibility for benefits, as measured pursuant to charter section 5-306(a), depends on the ability of a person to perform "required duties" at the time when the person is actively employed at the Bureau of Fire. In other words, the term "required duties" contains a contemporaneous element whereby it relates to the time when the member is an active employee. That temporal requirement is also evident in the grammatical phrasing of the charter section: an active member is eligible "when unable to perform the *Member's required duties.*" (Emphasis added.) Along with the reference to an active member, the use of the term "the Member's required duties" references the member's required duties prior to that person receiving disability benefits.

The term "required," in the context used in the charter, refers to something compelled or commanded to be done. *See Webster's Third New Int'l Dictionary* 1929 (unabridged ed 2002). Likewise, "duty" refers to an obligatory

task or conduct. *Id.* at 705. Thus, under its plain meaning, the term "required duties" refers to conduct or tasks the employer could compel or command an employee to perform. That plain meaning, taken together with the temporal aspect of the charter, leads us to conclude that "required duties," as used in section 5-306(a) of the charter, refers to any tasks that the member could have been commanded to do at the time the member was actively employed with (in this case) the Bureau of Fire. Thus, we are not persuaded by plaintiffs' assertion that the term "required duties" refers to the particular job that the member was actually doing at the time he or she was injured. Instead, a member is eligible if unable to perform the duties that could have been required of that member at the time he or she was actively employed.

Here, as noted, plaintiffs assert that "required duties" means the particular duties they performed as firefighters at the time they became injured or disabled. However, as we have explained, the term refers not only to duties they actually performed, but also to any conduct or tasks that the employee *could have been* required to do by the employer at the time they were still actively employed. On summary judgment, the city submitted evidence that, upon their return to work, "no plaintiffs in this case were given job duties outside the range of job duties they *could have* been assigned prior to their injuries." (Emphasis added.) The evidence submitted by plaintiffs did not controvert that: They averred that they were required to return to work in light-duty jobs other than the job of "firefighter," that those light-duty jobs had not existed at the time they became disabled, and that the jobs were, in fact, "make-work" jobs. They did not assert that, contrary to the city's evidence, they were given duties upon their return to work that were outside the range of tasks they *could have* been assigned to do before they became disabled. Given that, under section 5-306(c) of the charter, any requirement that a member receive a "minimum benefit [of] 25 percent of the Member's rate of Base Pay" is predicated on the member continuing to be eligible, along with the fact that member is eligible when he or she cannot perform "required duties," based on the arguments before us, we cannot conclude that the city breached the express terms of the charter by reducing

plaintiffs' benefits as alleged in this case. Thus, the trial court did not err to the extent that it granted summary judgment on that basis.

In addition to their assertion regarding the meaning of "required duties" under section 5-306 of the charter, plaintiffs also argue that the city engaged in a course of conduct and made representations that became part of the contract. In particular, they contend that the city treated disabled firefighters and police officers as permanently separated from employment and not required to return to work for the city; they also assert that employees of the city had promised plaintiffs that they would not be required to return to work for the city and that they had relied on those promises to their detriment. Thus, they alleged in their complaint and argued on summary judgment that the requirement that plaintiffs return to work for the city was a breach of the contract based on that existing course of conduct and on estoppel. Those assertions are unavailing.

Written and oral representations and assurances can become part of an employment-related contract with a government entity. *Watkins*, 243 Or App at 61; *see Brunick v. Clatsop County*, 204 Or App 326, 333, 129 P3d 738 (2006) (holding that "personnel rules may create implied terms in a county employee's employment contract"). However, whether such representations "are contractual depends on the intentions of both parties" and, when a "contract is created by statute or ordinance, that question reduces to a question of legislative intent." *Watkins*, 243 Or App at 61. Here, plaintiffs point to no ordinance that supports the proposition that the types of assurances and conduct of city employees as are at issue in this case would become part of the express legislative contract between plaintiffs and the city. To the contrary, section 8-104 of the city charter provides that, with certain exceptions, the city "shall not be bound by any contract nor in any way liable thereon, unless the same is authorized by an ordinance and made in writing and signed by some person or persons duly authorized by the Council." That ordinance section expresses a clear intent that the city *not* be bound by an agreement or representation unless the agreement is (1) authorized by ordinance, (2) in

writing, and (3) signed by an authorized person. Given that clear expression of legislative intent, we cannot infer that the city would have intended to permit terms to be added to the contract at issue here either by a course of conduct or by assurances from city employees.

With respect to plaintiffs' estoppel theory, "[i]n Oregon, it is well recognized that promissory estoppel * * * is a subset of and a theory of recovery in breach of contract actions." *Neiss v. Ehlers*, 135 Or App 218, 227-28, 899 P2d 700 (1995). Furthermore, promissory estoppel can, in limited circumstances, be applied to governmental entities. *See Wiggins*, 295 Or at 683 (a municipality may be bound by a promise of its agent "if (a) the municipality clothes the agent with apparent authority, (b) the promise is one which the municipality could lawfully make and perform, (c) there is no statute, charter, ordinance, administrative rule, or public record that puts the agent's act beyond his authority, (d) the person asserting the authority has no reason to know of the want of actual authority, and (e) the municipality has accepted and retained the benefit received by the municipality in return for the promise"); *see also Arken v City of Portland*, 351 Or 113, 139, 263 P3d 975, *adh'd to on recons*, 351 Or 404, 268 P3d 567 (2011) (observing that "not every one of the circumstances noted in *Wiggins* will necessarily be required in every case to conclude that promissory estoppel may appropriately be applied to a governmental entity"). However, in this case, as set forth above, section 8-104 of the city charter makes clear that the city does not intend to be bound by promises or agreements by city employees when those promises are not authorized by ordinance. In other words, under the city charter, it is outside the authority of a city employee to bind the city to a promise that is not authorized by ordinance. Here, there is no indication that any ordinance authorized the alleged representations that plaintiffs would not be required to return to work for the city. Because the city charter puts the alleged promises in this case outside the authority of the city employees who made them, promissory estoppel does not support plaintiffs' claim for breach of contract based on those promises. *See Arken*, 351 Or at 139-40 (declining to apply the doctrine of promissory estoppel in the context of a statutory contract).

For those reasons, the trial court did not err in granting summary judgment as to those parts of plaintiffs' breach of contract claims arising out of alleged contract terms based on course of conduct and estoppel.

Plaintiffs also contend that summary judgment was inappropriate because there were issues of fact regarding whether the city breached its duty of good faith and fair dealing. *See Klamath Off-Project Water Users v. Pacificorp*, 237 Or App 434, 445, 240 P3d 94 (2010), *rev den*, 349 Or 602 (2011) (a "party may violate its duty of good faith and fair dealing without also breaching the express provisions of the contract" (internal quotation marks omitted)). As discussed, although the trial court granted summary judgment with respect to the entire case based on failure to exhaust administrative remedies, the court agreed with plaintiffs that genuine issues of material fact regarding the city's breach of its duty of good faith and fair dealing would preclude summary judgment on that issue. The city does not argue on appeal that that determination was incorrect. Given those circumstances, we conclude that it is appropriate to reverse the judgment with respect to the city's alleged breaches of its duty of good faith and fair dealing and remand as to that issue.

Reversed and remanded in part; otherwise affirmed.