402 October 30, 2014 No. 67

IN THE SUPREME COURT OF THE
STATE OF OREGON

John MILLER,
Randy Olson, Herbert Goss, Douglas Babcock,
Henry Jackson, and Michael Palin,
*Petitioners on Review,*

*v.*

CITY OF PORTLAND,
an Oregon municipal corporation,
*Respondent on Review.*

(CC 081014715; CA A145318; SC S061421)

En Banc

On review from the Court of Appeals.*

Argued and submitted January 16, 2014.

Montgomery W. Cobb, Montgomery W. Cobb, LLC, Portland, argued the cause and filed the brief for petitioners on review.

Franco A. Lucchin, Deputy City Attorney, Portland, argued the cause and filed the brief for respondent on review.

James S. Coon, Swanson Thomas Coon & Newton, Portland, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

BREWER, J.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

Balmer, C.J., dissented and filed an opinion, in which Landau, J., joined.

_____

* Appeal from Multnomah County Circuit Court, Richard Maizels, Judge *pro tem.* 255 Or App 771, 298 P3d 640 (2013).

**BREWER, J.**

Plaintiffs had been fire fighters for the city of Portland when they suffered disabling injuries. The charter for the city requires it to provide disability benefits to its police and fire employees who suffer injuries in the course of their employment that render them "unable to perform [their] required duties," with a minimum disability benefit of 25 percent of the employee's base pay, "regardless of the amount of wages earned in other employment." The city originally determined that plaintiffs' disabilities made them unable to perform their "required duties" and paid them disability benefits. Years later, however, the city created new job assignments that included some of the duties within the job classifications that plaintiffs had held when they were injured. Because the city gave the new job assignments the same job classifications that plaintiffs had previously held, the city maintained that plaintiffs were no longer disabled. The city therefore required plaintiffs to return to work and discontinued paying them even the minimum disability benefit.

Plaintiffs brought a civil action against the city for breach of contract, and the circuit court granted summary judgment for the city. The Court of Appeals affirmed in part and reversed in part. *Miller v. City of Portland*, 255 Or App 771, 298 P3d 640 (2013). On review, we conclude that the city charter's use of the term "required duties" means core duties—those duties that are necessary or essential to the job. Because there is a genuine issue of material fact as to whether the duties of plaintiffs' new job assignments were the "required duties" for the job classifications that plaintiffs previously held, we further conclude that the circuit court erred in granting summary judgment in favor of the city. Accordingly, we affirm in part and reverse in part the decision of the Court of Appeals, and we reverse the judgment of the circuit court and remand to that court for further proceedings.

## FACTS

As noted, the circuit court granted summary judgment for the city. Because plaintiffs were the nonmoving parties, we set out the facts (and the inferences from those

facts) in the light most favorable to them. *See* ORCP 47 C (on summary judgment, circuit court must determine whether there is no genuine issue of material fact "based upon the record before the court viewed in a manner most favorable to the adverse party"); *Loosli v. City of Salem*, 345 Or 303, 306 n 1, 193 P3d 623 (2008).

Plaintiffs were all hired by the city to work for Portland Fire and Rescue under the job classification "Fire Fighter."[1] They were first hired between 1980 and 1990. At all relevant times, Chapter 5 of the city charter provided for a Fire and Police Disability and Retirement Fund (the disability fund).[2] Briefly, the disability fund provides benefits for (among other things) member employees who are injured on the job. The test for benefits is whether the member employee is "unable to perform the Member's required duties." Portland City Charter § 5-306(b). Disability benefits include payments based on the member employee's base pay at the time of the injury, decreased by the member employee's earnings through "other employment." *See id.* § 5-306(e). "[R]egardless of the amount of wages earned in other employment," however, while disabled, the employee would receive a minimum payment of 25 percent of base pay. *Id.* § 5-306(e) 4.

Plaintiffs suffered disabling injuries while in the course of their employment. The city does not dispute that it (1) determined that plaintiffs were "unable to perform [their] required duties"; (2) gave them medical layoffs; and (3) paid them disability benefits for several years. The city also does not assert that plaintiffs' medical conditions have improved in a way that would permit them to perform the "required

---

[1] Plaintiff Miller was later promoted to the job of "Fire Inspector" in 1999. In 2007, plaintiff Babcock had started to return to work as the city required before he tested and was given the "Fire Inspector 1" classification. The city does not assert that those factual differences affect the appropriate legal analysis on review. We do not otherwise decide whether those factual differences might affect the rights of either of those individual plaintiffs to obtain relief in this action.

[2] The charter provisions have been amended multiple times over the years. However, for purposes of simplicity, we will refer to the relevant city charter provisions as they exist today. We do so because the differences between the various versions do not appear to have any legal import to the issues presented to this court. That is, for purposes of our analysis here, the relevant provisions are essentially identical from version to version.

duties" initially used to determine that plaintiffs were disabled. Nor does the city assert that the duties included in the job classifications that plaintiffs had held when they became disabled have changed since plaintiffs became disabled.

The summary judgment record does not show precisely what the city considered plaintiffs' *required* duties" to have been when they became disabled. The record does, however, include more general evidence of the duties of a "Fire Fighter." The description contained in the city's official "Fire Fighter Classification" document provides:

> "This is general duty fire fighting work. Employees occupying positions of this class are responsible for the protection of life and property through the suppression and prevention of fires and in the response to emergency calls. Major elements of the work include participating in supervised drills, training in fire fighting skills and rescue techniques, and participation in hydrant and building inspection activities."

A Fire Fighter must be able to perform firefighting tasks in any number of different situations:

> "All employees of this class perform almost all fire fighting tasks associated with an engine, truck, rescue squad, or fire boat company, since personnel are rotated for administrative and personal reasons."

The classification document goes on to list examples of work that a Fire Fighter may be required to perform in different contexts. For example, the duties of a Fire Fighter with an engine company include laying and connecting hose to a hydrant and holding nozzles to direct fog or water streams. The duties of a Fire Fighter with a truck company include raising ladders and rescuing building occupants. The duties of a Fire Fighter with a fire boat company include functioning as a deckhand and operating the boat engine and pumps.

After plaintiffs were determined to be disabled and placed in medical layoff status, they turned to different pursuits. Some obtained other employment or became involved in business ventures, while one began to take care of his child full time. One moved to eastern Oregon, and a second sold his home and moved to Mexico.

Beginning in 2006, the city instituted a "Return to Work" policy and program. The city's "Return to Work" policy provided that the city would identify "restricted duty" assignments that would be

> "suitable for a member whose restrictions are of a permanent nature and prevent the member from performing front-line fire fighting or police work."

Under that program, the city created new job assignments, such as "low hazard fire inspector," with duties that plaintiffs could perform within the limitations imposed by their disabilities.

There is no indication in the record that the city rewrote its job classifications under the Return to Work program. Instead, the city selected duties from within existing job classifications, designated the resulting aggregations of duties as "restricted duty" assignments, and gave those assignments the same job classifications that plaintiffs had held when they became disabled.[3] Although the restricted duty assignments were composed of subsets of the duties in plaintiffs' respective job classifications at the time that they became disabled, those assignments excluded many of the "[m]ajor elements of the work" described in the quoted Fire Fighter classification document. The city then determined that plaintiffs no longer qualified for disability benefits because plaintiffs could perform the "required duties" of the new restricted duty assignments. Accordingly, the city ceased making disability payments to plaintiffs without regard to whether they accepted the new jobs.

Five plaintiffs accepted the jobs. Although the city ceased paying them disability benefits, the director of the disability fund never provided those plaintiffs with any formal notice that their benefits had been discontinued. The sixth plaintiff, Olson, did not accept the proffered job. He was the only plaintiff who received formal notice of the termination of his benefits.

---

[3] For most plaintiffs, the job classification was "Fire Fighter." In Miller's case, the city designated the job as being in the "Fire Inspector" classification. As noted, Babcock tested into the "Fire Inspector 1" classification.

Plaintiffs dispute whether the city lawfully and properly designated the new restricted duty assignments as within the classification "Fire Fighter." For purposes of this opinion, we need not resolve that question.

The interim director of the disability fund sent a letter to Olson dated April 12, 2007, stating that, in March 2007, Olson had been medically approved to perform the job duties of a low hazard fire inspector and that he had been directed to report for duty on April 5, 2007. The letter then stated that Olson's disability benefits had been terminated effective April 5, 2007, because he was no longer disabled or eligible for benefits. The letter continued:

> "You have 14 days from the date of this letter to provide a written response for the Director's consideration.
>
> "If the Director does not hear from you within the 14-day time frame, this denial is affirmed and you then have 60 days from April 26, 2007 to appeal to a hearings officer. * * *"

On April 26, 2007—within the 14-day period—Olson's attorney sent a letter to the director asking her to reconsider the termination of his benefits. Neither the director nor the city took any action in response to Olson's request.

## PROCEDURAL POSTURE

As noted, plaintiffs commenced a civil action against the city for breach of contract. In their complaint, plaintiffs alleged that the city was obligated by contract to pay them disability benefits, either pursuant to the terms of the charter or based on written and oral representations of city employees, and that the city had breached that contract. Plaintiffs sought damages and injunctive relief for the asserted breach.

The city moved for summary judgment, offering a number of different arguments. One was procedural: The city contended that plaintiffs were not entitled to proceed with the action because they had failed to exhaust their administrative appeal rights. The city also sought summary judgment on the merits. The city contended that the provisions of the city charter did not form a contract for disability benefits with plaintiffs, and that, pursuant to the charter, any written and oral representations by city employees could not form a contract in the absence of a city ordinance. Furthermore, if there was a contract, the city asserted, it had not breached that contract, because the city had offered

plaintiffs jobs with the same job classifications that they had held when they were injured. According to the city, it was irrelevant that those jobs had duties that constituted only a subset of the duties included in the job classifications that plaintiffs had held when they became disabled, because "required duties" under the charter meant whatever duties within those job classifications that the city chose to require.

The circuit court granted summary judgment for the city. The court primarily held that plaintiffs had failed to exhaust their administrative remedies. In addition, however, the court made alternative rulings regarding the city's other arguments. The court concluded that there was evidence of a contract, and so it denied that aspect of the city's summary judgment motion. It agreed with the city, however, that the city had not breached the terms of that contract, and so it was also entitled to summary judgment on that basis. Finally, the court held that there was a genuine issue of material fact as to whether the city had violated a duty of good faith and fair dealing by making certain oral and written representations to plaintiffs.

Plaintiffs appealed to the Court of Appeals. That court first held that the circuit court had erred in concluding that plaintiffs, other than Olson, had failed to exhaust their administrative remedies. The court explained that the director had not made the sort of "decision" contemplated either by the charter or in the disability fund's administrative rules that would trigger plaintiffs' obligation to request a hearing. 255 Or App at 780-81. However, the Court of Appeals agreed with the circuit court that Olson had failed to exhaust administrative remedies; the court reasoned that, regardless of the terms of the letter from the interim director, Olson was not excused from the need to request a hearing. *Id.* at 781-85.

The Court of Appeals then turned to the merits. After noting that the circuit court had denied summary judgment on the question whether a contract had been formed, *id.* at 785 n 8, the court considered whether summary judgment was appropriate on the breach of contract issue. The Court of Appeals agreed with the circuit court that the city was entitled to summary judgment on that

question. In so concluding, the court reasoned that, as used in the city charter, "required duties" meant "any tasks that the member *could have been* commanded to do at the time the member was actively employed" by the city and that it was undisputed that the new job assignments given to plaintiffs consisted of duties that the city could have assigned them before they became disabled. *Id*. at 787 (emphasis added). Furthermore, the court held that the written and oral representations made by city employees had not become part of the contract. *Id*. at 788-90. Because the circuit court had concluded that there was a genuine issue of material fact on the question whether the city had breached its duty of good faith and fair dealing, however, the Court of Appeals remanded to the circuit court for further proceedings. *Id*. at 790.

On review, plaintiffs challenge the Court of Appeals' conclusions that Olson failed to exhaust his administrative remedies and that the circuit court properly granted summary judgment to the city on the breach of contract claim. We ordinarily would begin with the exhaustion doctrine, because a failure to exhaust would preclude plaintiffs from bringing any action at all, regardless of its merit. However, because that issue pertains to only Olson, we postpone our discussion of it to follow our consideration of the merits of plaintiffs' breach of contract claims.[4]

## BREACH OF CONTRACT

As a preface, we note that the circuit court concluded that there was a genuine issue of material fact as to whether a contract had been formed for the disability benefits at issue in this case. The Court of Appeals assumed without deciding that the pertinent charter provisions constituted a

---

[4] The city asserts in its brief on the merits that the Court of Appeals erred when it held that the five plaintiffs other than Olson were not required to exhaust their administrative remedies. *See* 255 Or App at 778 (summarizing Court of Appeals' conclusion as to plaintiffs other than Olson). We do not reach that issue. Generally, the questions before this court on review are limited to those "that the petition or the response claims were erroneously decided by" the Court of Appeals. ORAP 9.20(2) (unless this court otherwise limits questions on review). Here, the city filed neither a response to plaintiffs' petition for review nor a petition for review in its own right. Although this court has discretion to consider "other issues that were before the Court of Appeals," *id*. (court "may" consider those issues), we decline to do so here.

contract. 255 Or App at 785 n 8. For purposes of our review, the city also expressly assumes that those provisions were part of a contract. We therefore assume that the provisions of the city charter created a contractual obligation, without addressing the specific mechanism by which that happened.

Instead, we consider whether the city was entitled to summary judgment on the ground that there was no breach of the contract that had been formed. As noted, the parties' dispute focuses on how the charter for the City of Portland uses the term "required duties." The charter was adopted and amended by the voters of that city. *See* Or Const, Art XI, § 2 ("The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon[.]"). We interpret legislation enacted by the voters in the same way that we interpret legislation enacted by the legislature, by first examining the text in context, together with any relevant legislative history. *See Burke v. DLCD*, 352 Or 428, 432-33, 290 P3d 790 (2012) (so explaining).

The charter provision that is most significant here is section 5-306, which defines when an employee is disabled. It provides:

> "An Active Member shall be eligible for the service-connected disability benefit when unable to perform the Member's required duties because of an injury or illness arising out of and in the course of the Member's employment in the Bureau of Police or Fire."

Portland City Charter § 5-306(b). A "Member" is any of "those persons who are permanently appointed as sworn employees in the Bureau of Police or Fire" (with certain exceptions not relevant here). *Id.* § 5-301(a). An "Active Member" is "a person who is actively employed as a Member in the Bureau of Fire or Police and does not include a Member receiving disability or retirement benefits under this Chapter." *Id.* § 5-301(b).

The charter also addresses what happens during the period when a member remains disabled—that is, "the period [that] the Member continues to be eligible" under section 5-306(b). *See id.* § 5-306(e). The disabled member

is obligated to seek "other employment." *See id.* § 5-306(e) 5 ("The Fund Administrator may suspend or reduce the benefit if the Member does not cooperate in treatment of the disability or in vocational rehabilitation or does not pursue other employment."). The charter then provides a schedule of benefits derived from the disabled employee's base pay, reduced by any earnings from "other employment." *Id.* § 5-306(e) 1-4. As long as the member "continues to be eligible"—that is, as long as the member remains "unable to perform the Member's required duties"—the member is entitled to a minimum disability benefit of 25 percent of base pay. *Id.* § 5-306(e) 3-4.

The city acknowledges that the phrase "the Member's required duties" refers to the "required duties" of the job classification that the member had held when he or she became disabled.[5] In other words, the city does not argue that it can *add* duties to the duties included in the job classifications that plaintiffs held when they became disabled. Nor does the city argue that "the Member's required duties" permits it to look to the "required duties" of any other job classification within the Bureau of Fire—"Harbor Pilot" or "Assistant Public Education Officer," for example. Rather, the city argues that "required duties" means "any conduct or tasks that the Fire Bureau could have required plaintiffs to do at the time they were still actively employed." (Emphasis and capitalization deleted.) For the majority of plaintiffs in this case, the relevant question would be what are the "required duties" for the job classification "Fire Fighter."

The Court of Appeals held, and the city agrees, that the word "require" means "something compelled or commanded to be done." *See* 255 Or App at 786 (citing *Webster's Third New Int'l Dictionary* 1929 (unabridged ed 2002)). That does summarize one definition of "require":

> "5 : to impose a compulsion or command upon (as a person) to do something: demand of (one) that something be done or some action taken : enjoin, command, or authoritatively insist (that someone do something)[.]"

---

[5] Thus, the city does not assert that it is significant that section 5-306 of the city charter expressly refers to the "Member's" required duties, not those of a position or job classification. Nor is there any indication in the record that the city created light or limited duty jobs for plaintiffs that were specifically tailored for them as individuals.

*Webster's* at 1929. Based on the city's interpretation of "required duties," the city maintains—and the Court of Appeals agreed—that the city could "require" plaintiffs to perform duties selected from those within the job classification; those duties then would become the test for continuing disability. *See* 255 Or App at 786-87 (so holding).[6]

As we now explain, we think that both the Court of Appeals and the city erred in analyzing the meaning of "required duties." To determine which meaning should be attributed to "required," we first examine the word that "required" modifies: "duty." A "duty" is something that one is obligated to perform. In context, the word "duty" means:

> "2 a : obligatory tasks, conduct, service, or functions enjoined by order or usage according to rank, occupation, or profession <*duties* that he knew he would have to do—\*\*\*>."

*Webster's* at 705 (emphasis in original). When the city argues that "required" means "something compelled or commanded to be done," then, it arguably renders the word "required" superfluous. That is, a "duty" is a task that an employee is already obligated to perform as part of that person's job. Accordingly, if one accepts the city's interpretation of "required" as a command by the employer, then, in a fundamental sense, all of an employee's duties are "required duties."

Accepting the city's understanding of "required duties" also would result in an interpretation that would disadvantage both the city and its employees. It would disadvantage the city, because a member employee who became disabled

---

[6] In its brief, the city also asserted that an administrative rule that purportedly predated the relevant text served as context to show that "required duties" meant whatever duties the city chose to assign. *See* Fire and Police Disability, Retirement and Death Benefit Plan Administrative Rules III A ("A Member who is unable to perform his or her usual job but is able to do other work to which the Member may be assigned in his or her respective Bureau, is ineligible for disability benefits if such a job is available to the Member."). At oral argument, however, the city acknowledged that the relevant charter provision actually had been adopted first. The relevant text of Portland City Charter § 5-306(b)—providing that a member employee was disabled when "unable to perform the Member's required duties"— had been adopted in 1989, while the rule had not been promulgated until 1991. Accordingly, the administrative rule is not context that would have affected how the voters in 1989 had understood the text. *See Stull v. Hoke*, 326 Or 72, 79-80, 948 P2d 722 (1997) (noting that subsequent legislation was not context for previously enacted statute).

from performing *any* duty associated with a job—no matter how incidental or trivial that task was—could credibly claim to be entitled to full disability benefits.[7] And, it would disadvantage member employees, because a member's status could change from fit to disabled and back again at any time, depending on which subset of duties in the pertinent job classification that the city decided to "require" on a particular day. We do not think that the voters who adopted the charter, or the city, or the member employees would have understood the disability fund to work that way.

Instead, the word "required" would seem to carry a different meaning in this context, one that focuses on the core duties of a job, that is, those duties that are necessary or essential to the job. In that vein, the word "require" also means:

> "3 a : to call for as suitable or appropriate in a particular case : need for some end or purpose <contributions to American Art ~ more detailed treatment—*Amer. Guide Series: Minn.*> b : to demand as necessary or essential (as on general principles or in order to comply with or satisfy some regulation) : make indispensable <the inference . . . is not absolutely *required* by the facts—\*\*\*> <no religious test shall ever be *required* as a qualification—*US Constitution*>"

*Webster's* at 1929 (alteration and emphases in original). That meaning better fits the nature of the charter provisions creating the disability fund, because the city would want to pay disability benefits to only employees who are unable to perform the necessary or essential tasks of the job. Thus, a fire fighter who cannot perform some incidental task is not disabled, but a fire fighter who cannot fight fires almost certainly is.[8] Viewed in that way, the required duties of the job classifications that the city has created are

---

[7] The city might well reply that, if its interpretation of the term "required duties" is correct, the disadvantage at most would be temporary, because the city could summarily reassign the disabled member to a new job in the same classification with fewer required duties that the employee could perform. Granted, but the question remains why the voters would have intended to place either the city or its employees in a situation where such maneuvering either would be necessary or permissible.

[8] It makes little sense, for example, to conceive of a fire fighter as having only the duties of, say, a receptionist.

co-extensive with what it means to be disabled from performing those jobs. By contrast, if "required duties" means *any* one or more duties constituting a subset of plaintiffs' job classifications when they became disabled—no matter how trivial or incidental to the essential functions of their jobs— then it is difficult to understand how they became disabled in the first place.

The charter's treatment of "other employment" supports the conclusion that disability is to be determined with reference to a particular job classification. The charter contemplates that one can be disabled from being a "Fire Fighter" while still being capable of performing gainful activity. In fact, the charter expressly provides that a disabled employee will continue to receive disability payments of 25 percent of base pay, even if the disabled employee's other employment pays more than the former job with the city. In addition, "other employment" necessarily means employment that does not involve performing the "required duties" of the disabled employee's former job classification. Nowhere does the charter focus on an employee's job title; it is the "required duties" of the job that has legal significance. That implies that, if the city gives a disabled employee a job with different "required duties," then the employee has received "other employment"—not that the employee is no longer disabled.

We also consider prior versions of the charter as context in interpreting its meaning. *See [State v. McDowell](#)*, 352 Or 27, 30-31, 279 P3d 198 (2012) (in interpreting statute, "[c]ontext may include *** prior versions of the same statute"). The voters first enacted Chapter 5 of the Portland City charter in 1948, creating the Fire and Police Disability, Retirement and Death Benefit Plan. Like the current version of the charter, the provisions of the plan made entitlement to benefits contingent on a member being unable to perform "required duties." Section 5-115 of the 1948 charter stated:

"BENEFITS UPON SERVICE CONNECTED DISABILITY. Upon duly verified application of a member and a finding by the Board that through injury or sickness caused by the performance of duty or in line of duty *the member*

*has been unable to perform his required duties*, said member shall be paid disability benefits \*\*\* *until said member recovers* or for a period of one (1) year, whichever period is shorter. \*\*\* In the event said member *has not recovered* at the end of one year he shall receive after said first year and *until he recovers*, but for a period not to exceed three additional years, disability benefits from the fund equal to but not in excess of his full salary \*\*\* . If the disability continues after the end of four (4) years, the member shall be paid benefits from the fund in an amount equal to a maximum pension *until he recovers* or until he would have become eligible for a maximum pension by reason of years of service or age, at which time he shall be retired by the Board and receive said maximum pension. \*\*\*

"\*\*\*\*\*

"*In the event of recovery* of any member from service connected or occupational disability, he shall upon certification by the Board, be *restored to service in the rank he occupied at the time of his retirement or disability* and his pension or disability benefit shall cease upon restoration to service."

(Emphases added.)

When considered as a whole, the 1948 charter is inconsistent with the city's interpretation of the term "required duties." First, disability itself is measured by whether the member "*has been* unable" to perform the "required duties," implying that the "required duties" are duties that were "required" prior to the time of the disability determination. Second, the city may cease disability payments only if the member "recovers," implying medical recuperation rather than any alteration in the duties. And third, if a member does recover, the member will be "restored to service in the rank he occupied at the time of his retirement or disability," implying at least some degree of continuity between the job before disability and the new job after recovery. Taken together, those aspects of the 1948 charter suggest that "required duties" is not a term that the city can redefine for a particular member after he or she becomes disabled (at least in the absence of a modification of required duties for a job classification as a whole).

The voters substantially revised chapter 5 of the Portland City Charter in 1989, to essentially the form

that it takes today. In doing so, the voters retained the term "required duties," although they modified other text surrounding it—replacing "has been unable" with "when unable," for example. Of course, amendments to statutory text may modify the meaning of particular terms found in the text. But the city has not argued—and we cannot identify—anything about the 1989 modifications that would show that the voters had intended to change the meaning of the words "required duties." The voters merely removed contextual clues that would have made the problems with the city's argument more manifest. Whatever the words "required duties" meant in 1948, then, they continued to mean in 1989.[9]

For the foregoing reasons, we reject the city's interpretation of "the Member's required duties" as being whatever subset of duties within plaintiffs' former job classifications—irrespective of whether those were or now are the core duties of those job classifications—that the city chose to require after plaintiffs became disabled. Instead, we conclude that, as used in the city charter, the term refers to the core duties—those that are necessary or essential—of whatever job classification the member held at the time that he or she became disabled. Because the summary judgment record does not establish beyond dispute the duties of a "Fire

---

[9] In interpreting the charter, we also may consider the history behind the adoption of the provision. *See Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 560 n 8, 871 P2d 106 (1994) (so noting in context of constitutional amendment adopted through initiative process). In this case, that history would include the ballot title. *See id.* We have examined the ballot title for the 1989 amendments, but we find nothing relevant to the particular issue before us. The ballot title for the 1989 charter amendments read as follows:

"CHARTER AMENDMENT REVISING FIRE AND POLICE PENSION AND DISABILITY PLAN

"Question:   Shall the City Charter be amended to reform the Fire and Police Disability, Retirement and Death Benefit Plan?

"PURPOSE

"Reforms plan for new fire and police hires and present employees who choose it. Improves retirement and survivors benefits. Establishes five year vesting period. Restricts and reduces disability benefits. Allows benefit changes required by law. Restricts adjustments of retirement and survivor benefits to percentage adjustment given fire and police employees in state retirement system. Eliminates employee contributions to plan. Increases property taxes collected within existing rate levy by approximately $.39 per $1,000 of assessed valuation. City guarantees to pay full benefits if levy becomes insufficient."

Fighter" or a "Fire Inspector" that are necessary or essential to those jobs, there is a genuine issue of material fact as to whether the new assignments given to plaintiffs involved the "required duties" of their former job classifications that precludes summary judgment.[10]

For that reason, we need not reach plaintiffs' argument that the "required duties" of a job classification or position become fixed when a member employee becomes disabled. Even if the "required duties" were not fixed at that point in time, the city has not shown that it modified the "required duties" of the "Fire Fighter" position or that plaintiffs are able to perform the core functions of that job classification. At most, the city showed only that it had assigned a subset of the duties included in the job classifications that these plaintiffs held when they became disabled as part of their new job assignments.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

We turn, finally, to the city's argument that Olson failed to exhaust his administrative remedies. The doctrine of exhaustion of administrative remedies generally provides that "[j]udicial review is only available after the procedure for relief within the administrative body itself has been followed without success." *Mullenaux v. Dept. of Revenue*, 293 Or 536, 539, 651 P2d 724 (1982) (internal quotation marks and citation omitted; alteration in original). The city argues that Olson failed to exhaust his administrative remedies because he did not appeal the decision of the interim director. Olson, the city maintains, had to request a hearing within 60 days after the date of the director's April 12 letter—although the

---

[10] Indeed, the limited record on the question of what constitute the duties of a "Fire Fighter" suggests that the "Fire Fighter" plaintiffs may remain disabled and be entitled to disability benefits. The job description for "Fire Fighter" specifically identified it as a generalist position: "All employees of this class perform almost all fire fighting tasks associated with an engine, truck, rescue squad, or fire boat company, since personnel are rotated for administrative and personal reasons." The city's policy statement regarding the Return to Work program, however, characterizes the new assignments given to plaintiffs as "restricted duty" assignments, and it specifically states that those "restricted duty" assignments are for member employees whose disabilities prevent them from "performing front-line fire fighting or police work." From that, one could infer that the duties the city assigned to plaintiffs are not the "required duties" of the "Fire Fighter" position.

city concedes that the director gave Olson an extra 14 days to file a written response. To support its argument, the city relies on the following administrative rule for the disability fund:

> "For service-connected and occupational disability benefits \*\*\*, if the Director obtained evidence that \*\*\* the Member is no longer disabled or eligible \*\*\*, the Director shall notify the Member of the Director's decision to suspend, reduce or terminate benefits. A summary of the evidence and the decision shall be provided to the Member. \*\*\* The Member will have 14 days to provide a written response for the Director's consideration. The Member shall also be notified of the rights under Charter Section 5-202(h) and the right to appeal for a Hearing as provided for in Section IV. Any such written request must be filed with the Director within 60 days after the date of the decision being appealed."

Fire and Police Disability, Retirement and Death Benefit Plan Administrative Rules III G (7) (2007).

The Court of Appeals essentially agreed with the city's argument. Regardless of whether the letter from the director was binding on the city, the court concluded, both the letter and the rule indicated that the written response to the director was only an interim step in the administrative review process. 255 Or App at 783-84. According to the court, the director's letter neither excused Olson from the obligation to request a hearing nor prohibited him from making the request; at most, the letter showed that he had an extra 14 days in which to make the hearing request. *Id*. at 784-85.

The exhaustion doctrine applies "where one seeks prematurely to obtain judicial review of or judicial intervention into the action of an agency \*\*\* without waiting to see whether the agency will in fact take the desired action." *Zollinger v. Warner*, 286 Or 19, 25, 593 P2d 1107 (1979). That doctrine, insofar as applicable here, is judicially created. *See* Richard J. Pierce, Jr., 2 *Administrative Law Treatise* § 15.2, 1219-20 (5th ed 2010) (distinguishing common-law exhaustion requirement from statutory exhaustion requirement); *Mullenaux*, 293 Or at 539 (noting that, in tax cases, particular statute "makes explicit the general rule" that a party

can obtain judicial relief only if party has exhausted administrative remedies); *Stanbery v. Smith et al*, 233 Or 24, 32-33, 377 P2d 8 (1962) ("[t]he majority of state and federal courts" apply the "general rule against reviewing questions not presented to the administrative agency"). The exhaustion requirement—at least in its common-law variant—is "not rigid but flexible" and is intended to promote "orderly procedure and good administration." *Marbet v. Portland Gen. Elect.*, 277 Or 447, 456, 561 P2d 154 (1977) (internal quotation marks and citations omitted); *see also* Pierce, 2 *Administrative Law Treatise* § 15.2 at 1219 (common-law exhaustion requirement "is flexible and pragmatic").

We decline to apply the doctrine of exhaustion rigidly here.[11] The interim director's letter to Olson expressly stated that Olson had 14 days to file a written response. By its terms, the letter negated any possibility that the 60-day period to request a hearing began to run either from the date that benefits were terminated (April 5) or from the date of the letter (April 12). Instead, the letter expressly stated that, *if* Olson failed to file a written response, the 60-day period would begin to run on April 26—a date 14 days in the future, when the time to file the written response would expire. Those express statements necessarily implied that the termination of benefits was provisional and that, if Olson did file a written response for consideration, the 60-day period to request a hearing would begin to run if and when the director "affirmed" her provisional decision to terminate benefits.

Given those circumstances, it would be difficult to explain why Olson should have disregarded the director's explanation of the hearing process. The director's letter set out what reasonably appeared to be the fund's authoritative position regarding how the fund would interpret administrative rule III G (7). Although the rule itself could have been interpreted differently, the director's position was not inconsistent with its text, because the rule does not explain the relationship between the 14-day response period and the 60-day appeal period. Generally, it is appropriate to defer to an agency's plausible interpretation of its own rule if it is not

---

[11] Olson does not argue that the doctrine is inapplicable to a decision of a local government regarding disability payments.

inconsistent with the rule's text or context or with any other law. *See, e.g.*, *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994) (so noting).

Olson did not seek judicial review without waiting to see what the city would do, *see Zollinger*, 286 Or at 25; he acted, and the city failed to respond. Because applying the exhaustion doctrine against Olson would discourage orderly procedure and good administration, we decline to do so. *See Welch v. Washington County*, 314 Or 707, 716, 842 P2d 793 (1992) (noting in tax context that taxpayers have been relieved from obligation to exhaust administrative remedies "most often in situations where the taxpayer has been misled regarding a filing or appeal requirement," and citing cases); Pierce, 2 *Administrative Law Treatise* § 15.2 at 1220 (common-law exhaustion requirement does not apply if "considerations of individual justice, efficiency, or wise judicial administration support the need for judicial review in the absence of exhaustion").

## CONCLUSION

To recapitulate: We conclude that Olson was not required to exhaust his administrative remedies to bring this action. Accordingly, we reject the circuit court's primary rationale for granting summary judgment to the city, and we reverse on that point. We leave undisturbed the Court of Appeals' determination that the other plaintiffs were not required to exhaust their administrative remedies.

We also reject the circuit court's alternative ground for granting summary judgment, which was that, as a matter of law, the city had not breached its contract with plaintiffs. Plaintiffs assert that the city wrongfully discontinued making disability payments to them. Disability payments may be discontinued if a member employee becomes able to perform the "required duties" of the job that the employee had held at the time of injury. As we have concluded, the "required duties" of a job means its core duties—those duties that are necessary or essential to the job. The summary judgment record does not establish what those "required duties" are, and the city has not shown that plaintiffs are able to perform those duties.

We emphasize the limits of our holding in reviewing the circuit court's grant of summary judgment. We do not mean to suggest that the city is precluded from changing its job classifications or the duties of those classifications in accordance with its lawful authority. We also need not decide whether such a change could cause a previously disabled employee to again become fit for work. And finally, our conclusion of course does not limit the city's ability to determine, as a factual matter, that a former employee is no longer disabled, in the sense that that employee has sufficiently recovered from his or her injuries to perform the "required duties" of the job.

With those provisos in mind, we turn briefly to the Chief Justice's dissent, which essentially echoes the city's position in this case. The dissent attempts to discount the redundancy in the city's interpretation of the term "required duties" by arguing that, although both words in the term refer to command or compulsion, "required" "emphasizes the role of the person or entity doing the requiring," whereas "duties" refers to "the set of all the 'duties' that could be commanded of someone in a particular position." 356 Or at 428 (Balmer, C.J., dissenting). From that proposed distinction, the dissent asserts that "'required duties' are the subset of those duties that the employer reasonably directs the particular employee to perform." *Id*.

As discussed, our interpretation of "required duties" focuses not on what particular task a supervisor currently requires, but on what a supervisor *may* require. The question thus is whether a fire fighter will be able to perform those tasks *if and when the need arises*.[12] In contrast, the interpretation that the city and the dissent advance conflates immediate tasks with overall duties by hinging disability status on whether a member can perform whatever individual task a supervisor has asked the member to perform on a particular day. Thus, the dissent repeatedly refers to "tasks," notes that "the city in fact does direct different fire fighters

---

[12] That focus is reflected in the duties listed in the "Fire Fighter" job classification, which also emphasizes that a "Fire Fighter" needs to be able to perform "almost all fire fighting tasks associated with an engine, truck, rescue squad, or fire boat company, since personnel are rotated for administrative and personal reasons."

to perform a wide variety of different tasks, depending on their work assignment," and concludes that it "can see no reason why members who are able to perform some needed tasks, but not others, cannot be directed to perform those tasks they can perform." 356 Or at 429 (Balmer, C.J., dissenting). Under that interpretation, if a supervisor orders a particular fire fighter to coil a hose, then "coiling a hose" is that fire fighter's "required duty" until that task is done. Once the fire fighter finishes that task, then the fire fighter's required duty becomes whatever task the supervisor next directs. On the other hand, for the city and the dissent, the *abilities* to direct water or fog streams with a nozzle, to raise ladders and rescue building inhabitants, or to function as a deckhand on a fireboat (*see* 356 Or at 406 (listing those duties)) are irrelevant, unless and until a supervisor actually directs a particular fire fighter to perform those particular tasks.[13]

The difficulty with that interpretation of required duties is that it does not provide a meaningful way to determine whether a particular injured member was or remains disabled and legally entitled to benefits. Adopting it would mean that, if a member could perform any subset of the duties in the member's job classification at the time that the member became disabled, then the city could at any time assign that subset of duties to the member and declare the disability at an end. If that were permissible, it is difficult to conceive how any of plaintiffs could have been deemed disabled in the first instance. Equally problematic, as discussed, is that a member could too easily be considered disabled if the member could not perform some of the tasks assigned to him or her on a particular day.

The dissent asserts that it is best left to another day to determine whether the city's task-centered interpretation

---

[13] We reiterate that the original charter provisions stated that a member was disabled if the member "has been unable to perform" "required duties," and the disability benefits would continue until the member has "recovered." If "required duties" meant only whatever subset of duties the city chooses to direct a member to perform, then the focus should be on what duties the city "is" or "will" require—not on whether the member "has been unable" to perform those duties. Furthermore, if the city could eliminate a disability merely by modifying future duties (even in good faith), then the obligation to end disability benefits should not have been limited to those situations in which a member has medically recovered.

would lead to bad faith or abuse in the manipulation of an employee's disability status; after all, the dissent notes, the question whether the city has breached its duty of good faith and fair dealing is still a live issue on remand. The question before us, however, is not whether the city has engaged in bad faith; rather, the interpretive question is why the voters would have intended to adopt such a slippery definition of disability. We conclude that they did not.

Finally, the dissent views our interpretation of "required duties" as unduly interfering with the city's prerogatives in managing its disability system. Respectfully, we do not share that view. As explained above, our interpretation is not narrow or rigid in the sense that the dissent posits; the question whether the city can change the required duties of any job classification to comport with technological advances or to serve its other business purposes is not before us, and nothing that we have said indicates that the city cannot make such changes if they are otherwise lawful. Nor is our objective to impose on the city our own conception of the essential duties of a fire fighter or any other position in the city's workforce. Those duties will be determined based on the evidence at trial, not judicial preference, and they will reflect the duties that the city itself considers to be the essential duties of the job.

In the end, we might speculate at length about why the city's voters would have adopted a disability system that provides a minimum benefit for disabled employees who find other work. In fact, some might well believe that providing a minimum benefit would encourage, not discourage, more self-sufficiency for disabled employees. But that is not our inquiry. The issue is what the voters intended, not whether there is cause for some to regret that decision.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**BALMER, C. J.,** dissenting.

The majority adopts a definition of "required duties," as that term is used in the Portland City Charter, that is

neither compelled by the ordinary meaning of those words nor likely consistent with the intent of the voters when they adopted that portion of the charter in 1948 or amended it in 1989. The result is a narrow and rigid construction of the "city constitution," *see Portland Police Assn. v. Civil Service Board*, 292 Or 433, 440, 639 P2d 619 (1982)—an interpretation that prevents the city from reasonably administering the Fire and Police Disability and Retirement Fund in a way that is fair to both disabled fire fighters and the city. For those reasons, I agree with the Court of Appeals that the city did not breach the express terms of the charter when it adopted a "return to work" program for disabled fire fighters. I respectfully dissent.

Section 5-306 of the charter provides that "[a]n Active Member shall be eligible for the service-connected disability benefit when unable to perform the Member's required duties ***."[1] The dispute in this case (or at least this part of this case) involves the city's assertion that the "required duties" of a fire fighter may include a subset of the duties listed in the fire fighter job classification, so that a fire fighter who is unable to perform all of the duties listed in the job classification because of a service-connected injury—but can perform some of those duties—may later be assigned to a "light-duty" position within the same job classification. Plaintiffs argue that, if a service-connected disability renders the fire fighter unable to perform all the duties "necessary to qualify as a Fire Fighter" because of a service-connected disability, then the fire fighter is disabled—and remains disabled—even if the fire fighter can perform some of the duties in the job classification and is directed by the city to do so. Because the fire fighter is "disabled," in the plaintiffs' view, as long as he or she is unable to perform the "necessary" duties in the fire fighter job classification, the fire fighter is entitled—at a minimum and "regardless of the amount of wages earned in other employment"—to disability benefits of 25 percent of his or her base pay. *See* Portland City Charter § 5-306(e)(4). The benefits for those persons increase each year, because they are "adjusted to

---

[1] As the majority does, "for purposes of simplicity, [I] will refer to the relevant city charter provisions as they exist today." *Miller v. City of Portland*, 356 Or 402, 405 n 2, ___ P3d ___ (2014).

reflect changes in the rate of Base Pay of the position held by the Member at disability." Portland City Charter § 5-306(f). They generally continue until the member reaches the "disability retirement age" or the social security retirement age, Portland City Charter § 5-304(a), at which time the member begins receiving retirement benefits. Individuals who were permanent sworn employees at the time of injury and receive disability benefits continue to be "members," for purposes of the disability fund, even if they no longer are active employees of the Bureau of Fire. Portland City Charter § 5-301.

The majority essentially agrees with plaintiffs' argument, holding that "required duties" means the "core" duties of a job. *See Miller v. City of Portland*, 356 Or 402, 404, ___ P3d ___ (2014). I briefly explain what I view as the majority's interpretive error and then turn to what seems to me to be a definition of that term that is more consistent with the city charter and more likely to have been intended by the voters in establishing the disability program.

The majority seeks to define the word "required" by first examining the word "duty," which "required" modifies. The majority takes the obviously correct dictionary definition and concludes that a "duty" is "something that one is obligated to perform." *Id.* at 413. However, it then rejects the city's argument that "required" is "something compelled or commanded to be done." The majority rejects that construction on the theory that it would render the word "required" superfluous, because the word "duty" already refers to something one is obligated to do. *Id.* To avoid the redundancy that it perceives, the majority instead concludes that the word "required" "would seem to carry a different meaning in this context, one that focuses on the core duties of a job, that is, those duties that are necessary or essential to the job." *Id.* at 414. The majority thus views "duties" as the larger set of tasks identified in a job classification or position description, and "required duties" as the subset of those tasks that are necessary or essential for the position. The majority supports its definition by citing a definition of "require" listed in *Webster's Third International Dictionary*, which refers to that which is "necessary or essential" and as "appropriate in a particular case" or necessary to comply

with "some regulation." *Id.* (quoting *Webster's Third New Int'l Dictionary* 1929 (unabridged ed 2002)). From that conclusion, the majority holds that a person who is unable, because of a service-connected injury, to perform the "core" duties of the fire fighter is disabled, even if the person is able to perform other duties within the fire fighter classification. *Id.* at 414, 417, 421 (defining "required" duties as "core" duties).

As noted, the majority goes in search of a different definition of "required" than that proffered by the city and accepted by the courts below because it concludes that the definition of "something compelled or commanded to be done" defines the word "required" to mean, essentially, the same thing as the word "duties" and therefore renders "required" superfluous. But the majority is wrong. The text that we are to construe provides that "[a]n Active Member shall be eligible for the service-connected disability benefit when unable to perform the Member's required duties * * *." Portland City Charter § 5-306(b). "Required" in this context, of course, is an adjective modifying the noun "duties," but it is simply an adjectival form of the verb "require." In this employment context, it seems obvious to me that the word is being used to describe the "duties" that the employer "requires" of the employee. The more appropriate dictionary definition of "require" in this case, therefore, is "to impose a compulsion or command upon (as a person) to do something : demand of (one) that something be done or some action taken : enjoin, command, or authoritatively insist (that someone do something)." *Webster's Third New Int'l Dictionary* 1929 (unabridged ed 2002). That definition focuses on what "duties" a person or entity (here the employer) "demand[s,]" "command[s,]" or "authoritatively insist[s]" that the "person" do. *See id.* The Court of Appeals reached the same conclusion, stating that "under its plain meaning, the term 'required duties' refers to conduct or tasks the employer could compel or command an employee to perform." *Miller v. City of Portland*, 255 Or App 771, 787, 298 P3d 640 (2013).

The definition of "require" that I propose is not rendered superfluous or redundant, contrary to the majority's view, simply because the definition of "duties" also contains the concept of being obligated. *See* 356 Or at 413. "Duty"

means "obligatory tasks, conduct, service, or functions enjoined by order or usage according to rank, occupation, or profession." *Webster's* at 705. The word "required," a form of a verb, emphasizes the role of the person or entity doing the requiring and certainly implies the authority of the entity to determine which of the "duties" are "required." There is a set of all the "duties" that could be commanded of someone in a particular position, but the "required duties" are the subset of those duties that the employer reasonably directs the particular employee to perform.

The majority defines the term "required duties" to mean the "core" duties of the job classification, but the word "core" appears nowhere in the text of any city charter provision or rule and appears to have been devised by the majority. The majority seeks to buttress its definition by suggesting that, if "required duties" meant only the duties within the job classification that the city directs an employee to perform, rather than "core" duties, the city could unfairly manipulate the duties that it requires of employees so as to deny them promised disability benefits. *See* 356 Or at 414 (arguing that the city could change "a member's status *** from fit to disabled and back again at any time, depending on which subset of duties in the pertinent job classification that the city decided to 'require' on a particular day"). That concern is misplaced, as least as it relates to the issues before this court.

First, nothing in the text indicates that all employees in a particular job classification must have the same "required duties" or that each employee must have the same "required duties" as long as they are in the same job classification—and the record demonstrates that they do not. We have been directed to no charter provision, administrative rule, or other source of law that affirmatively limits the city's authority, as an employer, to direct employees to perform some, but not other, tasks within the employee's job classification or position description. And, given the flexibility needed to administer a complex organization such as the Bureau of Fire and respond to evolving responsibilities and best practices, one would hardly expect such a rule. The required duties change based on changes in the Bureau of Fire's needs, technology, individual fire fighters' strengths

and weaknesses, and so on. Moreover, as the majority notes, the record shows that the city in fact does direct different fire fighters to perform a wide variety of different tasks, depending on their work assignment, such as working on a truck company, an engine company, or a fireboat company. *Id*. at 406. Nothing suggests that the management prerogative that permits such assignments does not also permit the city to assign fire fighters to perform some tasks within their job classification, but not others, as it deems appropriate. If the city can assign different tasks in that way to members who are not disabled, I can see no reason why members who are able to perform some needed tasks, but not others, cannot be directed to perform those tasks they can perform.

Second, to the extent that the city is alleged to have manipulated its administration of the disability plan and acted in bad faith in implementing the "return to work" policy, that issue is not before us. Plaintiffs' complaint alleged that the city violated the implied covenant of good faith and fair dealing. The trial court concluded that there were disputed issues of material fact regarding that claim, rejecting the city's motion for summary judgment on that ground, and the city did not appeal that ruling. The Court of Appeals remanded for further proceedings on that issue and the city did not seek review. *See Miller*, 255 Or App at 790. Those claims will thus proceed before the trial court.

Third, plaintiffs' concern that, under the city's interpretation of "required duties," it could eliminate the disability program entirely is not well taken. Implicit in the disability provisions of the city charter is the concept that the "required duties" at the time of a service-connected injury or illness are the duties that the member had been assigned at that time, and an employee who cannot perform those duties is entitled to disability benefits. But any employer with an employee who can perform some, but not all, of the duties the employee was previously required to do ordinarily may adjust work assignments and duties in order to keep the individual employed.[2] Nothing in the charter suggests that the

_____

[2] Indeed, this appears to be the practice in administering the Fire and Police Disability Plan. An administrative rule provides that "[a] Member who is unable to perform his or her usual job but is able to do other work to which the Member may be assigned in his or her respective Bureau, is ineligible for

duties of a fire fighter are so set in stone that they cannot be flexible and adapt to changing circumstances. Particularly when we are interpreting the "city's constitution," which can be changed only by a vote of the people, we should—absent clear evidence of contrary voter intent—avoid narrowly construing words of common usage in a way that frustrates the city's reasonable efforts to deliver public services effectively.

The common sense definition of "required duties" that I propose is supported by the context in which that term is found. *See State v. Fries*, 344 Or 541, 548, 185 P3d 453 (2008) (where multiple definitions might provide the plain meaning this court uses context to determine which was the one intended by the drafters). The city charter itself declares that "[r]estoring injured workers physically and economically to a self-sufficient status in an expeditious manner and to the greatest extent practicable is an important aspect of any disability system." Portland City Charter § 5-202(h)(1). The majority's interpretation of "required duties" makes it more difficult for employees to be restored "physically and economically to a self-sufficient status" by working a light duty job they are medically cleared to do. Under the majority's interpretation, members are unable to keep their jobs at all if they cannot perform what the majority deems to be the "core" duties of the work, causing a loss of income and economic self-sufficiency. Respectfully, determining what duties within the fire fighter job classification are "required" for an employee to perform the work the Bureau of Fire believes to be important is for the city, not for this court.

In summary, the voters most likely intended a definition of "required duties" that furthers the various goals

---

disability benefits if such a job is available to the Member. For example, a police officer whose injury prevents him or her from performing police duties in the field will be ineligible for disability benefits if the officer is capable of performing more sedentary duties and such sedentary position is available to the officer." FPDR Administrative Rules III.A (1991). That rule was adopted two years after the Portland City Charter provision at issue, 356 Or at 413, 413 n 6, and I do not suggest that voters would have understood the text with this particular administrative rule in mind. Rather, the administrative rule illustrates the general and common sense purpose of disability plans, which the voters likely would have had in mind just two years earlier. The majority too quickly dismisses this administrative rule as irrelevant. *See Halperin v. Pitts*, 352 Or 482, 490-91, 287 P3d 1069 (2012) (collecting cases to show that mere fact that statutes were later-enacted did "not mean that they [were] irrelevant").

of the disability plan for both the city and the employees—assisting employees with injuries in regaining their physical and economic self-sufficiency, ensuring city services provided by valued workers, and effectively using the city's human and financial resources. The definition proposed above is not only the common sense and plain meaning of the words of the city charter, but also one that furthers those goals. It allows the city to retain trained employees rather than overburdening other fire fighters or expending public funds to hire and train new employees to perform the tasks assigned to those in the position of plaintiffs. It benefits the employees, because they remain employed without the reduction in salary that disability payments entail. *See* Portland City Charter § 5-306(e) (specifying amount of disability benefits to be 75 percent of their previous base pay in effect at disability during the first year from the date of disability, and 50 percent after the member is medically stationary or after four years). Finally, it is unlikely that the voters intended the city to incur the expense of paying disability benefits until retirement age for individuals who are trained and able to perform work the city needs to have performed, but chose instead to end their employment with the city.

For the foregoing reasons, I respectfully dissent.

Landau, J., joins in this dissenting opinion.